[No. 45816. En Banc. October 4, 1979.]

THE DEPARTMENT OF NATURAL RESOURCES, ET AL, *Respondents,* v. THURSTON COUNTY, ET AL, *Appellants.*

*Patrick D. Sutherland, Prosecuting Attorney,* and *Alexander W. Mackie, Special Deputy,* for appellant Thurston County, et al.

*Thomas H. S. Brucker, Roger M. Leed,* and *Smith, Brucker, Winn & Ehlert,* for appellant Lake Lawrence Public Lands Protection Association, et al.

*Slade Gorton, Attorney General,* and *J. Lawrence Coniff, Jr., Assistant,* for respondent State.

*Philip P. Malone,* for respondent Lake Lawrence, Inc.

*Slade Gorton, Attorney General, Charles B. Roe,* and *Robert V. Jensen, Assistants,* amici curiae.

HOROWITZ, J.—The central issue raised by this appeal is whether the Thurston County Board of County Commissioners, considering whether to deny a preliminary plat on environmental grounds, is bound by a finding of the Shorelines Hearings Board in a related proceeding that the plat is adequate to protect the environmental resource. We hold the County Board is not precluded from reaching a different conclusion on the environmental issue and denying the plat, and that the Board's decision to deny the plat did not violate the applicant's constitutional rights. We accordingly reverse.

At issue here is the proposal of Lake Lawrence, Inc., to develop a 14–acre parcel of land known as Wood Point on the shore of Lake Lawrence, a small lake in Thurston County. The shoreline of the lake is presently only partially developed. Wood Point is in a natural state, covered with second–growth timber and dense underbrush. It is designated a "rural environment" in the county's Shoreline Master Program, allowing low–intensity land use, with residential development not exceeding two dwellings per acre. Title to the property is held by the State Department of Natural Resources in trust for the University of Washington. Desiring to make the land income–producing, the Department leased it to lake Lawrence, Inc., for a term of 55 years. The parties intended that the lessee would develop the land into single–family residential units.

In January 1977 Lake Lawrence, Inc., applied to the Board of County Commissioners (the Commissioners) for approval of a preliminary plat and shoreline substantial development permit for its project. In the ensuing months the County Planning Commission gathered evidence and testimony regarding the proposal. A draft environmental impact statement (EIS) was prepared, public hearings were held, and in May 1977 a final EIS was filed with the Planning Department. During the course of this investigation it became known to county planners that bald eagles use the Wood Point site for perching and feeding from the well–stocked lake. The EIS documented environmentalists' concern over the eagle habitat, and the conclusion of at least one consultant that development of Wood Point could drive bald eagles from the area. After visiting the site to observe perching eagles the planning staff recommended denial of the plat application. The Planning Commission itself, however, lacked a quorum to render a decision at its July 1977 meeting, and thus forwarded the proposal to the Commissioners with no recommendation.

The Board of County Commissioners held two public hearings on the plat proposal in August and September

1977. On the date of the second hearing the developer submitted a revised plat intended to provide more protection to the wildlife habitat, particularly to the trees identified as favored perching sites for the eagles. The revised plat set aside three lots on the shoreline as an eagle preserve and created a 75–foot buffer zone along the shoreline, but maintained a density of 22 residential units in the 14–acre parcel. After receiving testimony from environmental experts as well as members of the community, the Commissioners voted unanimously to deny the application for a preliminary plat and shoreline development permit. The denial was based on the eagles' status as endangered birds in Thurston County, the County's comprehensive plan calling for preservation of the County's wildlife, and the Department of Game's recommendation that a buffer strip of 200 feet or more be required to preserve the site's value as a bald eagle habitat. The proposed plat does not provide such a buffer between the eagles' preferred perches and human habitation or development, and it also allows substantial development between these perches and a marsh area which is critical to the eagle habitat. The Commissioners also voted at the September meeting to request the Planning Department to reconsider the master program designation of the area as rural in light of the evidence of its use as a habitat for endangered birds.[1]

Lake Lawrence, Inc., and the Department of Natural Resources (hereinafter referred to as respondents) sought review of the Commissioners' action through two separate and appropriate means. Review of the plat denial was sought in the Superior Court for Thurston County pursuant to RCW 58.17.180, a provision of the platting statute which provides for judicial review of any decision approving

---

[1]Contrary to respondents' contention, the Commissioners' request does not amount to an attempted rezone or spot–zone. It is not in itself a zoning action. Nor does it create a classification different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan which governs here. *Cf. Smith v. Skagit County,* 75 Wn.2d 715, 743, 453 P.2d 832 (1969).

or denying a plat. Review of the denial of the shorelines substantial development permit was sought before the Shorelines Hearings Board (the Board) pursuant to RCW 90.58.180, a provision of the Shoreline Management Act of 1971 (the SMA).

In February 1979, before the matter of the plat denial had come to trial in Thurston County Superior Court, the Board held a hearing on the denial of the shoreline development permit. The Board received substantial testimony regarding the proposed project and the environmental issues it raised. In its findings of fact the Board noted that bald eagles have long been observed at Lake Lawrence and the lake is an incidental perching area for these eagles. The Board also found that preservation of the perching trees together with a surrounding buffer was a proper condition of development of Wood Point. The Board found, however, that setting aside three waterfront lots as an eagle preserve, and maintaining a 75–foot buffer area along the shoreline provides adequate protection against significant adverse effect to the eagles. The Board concluded the proposed substantial development in the shoreline is consistent with the County's master program and the SMA, and that a permit for the shoreline development should not be denied. The Board's order thus reversed the denial of the shoreline development permit and remanded to the County for further proceedings.

Following the Board's decision the Commissioners moved in Superior Court to have the record on review of the plat decision returned to permit reconsideration. After the motion was granted and the record returned, the Commissioners called another public hearing to take additional testimony and to reconsider approval or denial of the plat based on the new evidence and the Board's decision. On April 24, 1978, after hearing additional testimony, visiting the site, considering the record and arguments of counsel, and considering an alternate configuration for the project which preserved the 22–unit density, the Commissioners once again unanimously denied the preliminary plat. The

Commissioners entered detailed findings of fact and conclusions of law, and gave specific reasons for its denial, thus meeting the requirements for specificity imposed by this court in *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978), which had been decided in the interim between the Commissioners' first and second votes on the plat.

The Commissioners disagreed with the Shorelines Hearings Board that the plat was adequate to protect the eagle habitat, finding it would be disruptive to feeding and perching activities and would not assure continued availability of the site to the eagles.[2] The Commissioners detailed at length the features of the plat proposal which are unacceptable, particularly the developer's insistence that 22 residential units be included. The Commissioners concluded such a plan could not adequately mitigate the adverse effect on the birds, that the proposal was not in the "public interest" within the meaning of the platting statute, and that the plat must therefore be denied.

Following this second denial of the preliminary plat the respondents filed a petition in Superior Court for a writ of mandamus to compel the Commissioners to issue a substantial development permit and to approve the plat. The petition was initially denied on the ground there was an adequate remedy at law. At the same time the court granted the motion of Lake Lawrence Public Lands Preservation Association, an association of interested local citizens, to intervene. At trial the court considered the full record before the Commissioners on remand, and also allowed respondents to reargue their mandamus claims. Upon entering findings of fact and conclusions of law, the court issued an order directing the Commissioners to issue a substantial development permit and to approve the preliminary plat.

---

[2]The Commissioners did not appeal the Board's finding, concluding the issuance of a shoreline substantial development permit was rendered moot by the denial of the plat.

The court's findings which are central to this appeal are: (1) the Commissioners are bound by the Shorelines Hearings Board's finding that the proposed plat is adequate to prevent any significant adverse effect on the eagles using the site; (2) the Commissioners have no authority under the platting statute to deny a plat on environmental grounds, and the authority to do so under the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, was preempted by the Board's decision on the matter; (3) the Commissioners' application of the "public interest" clause of the platting statute to deny the plat on environmental grounds renders the clause unconstitutionally vague; and (4) denial of the plat to preserve the perching and feeding site for the eagles is an unconstitutional taking.

We hold the Commissioners are not bound by the Shorelines Hearings Board finding, and that they have independent authority under SEPA to consider the environmental issue and deny the plat for environmental reasons. We further hold that denial of the plat in this case does not violate respondents' rights to due process, or constitute a taking of private property for public use without compensation.

I

The central question which emerges from this complex case is whether the Commissioners have the authority to deny a preliminary plat on environmental grounds and, if so, what effect the Shorelines Hearings Board's finding had on the Commissioners' authority here. There is no longer any question that a governmental decision–making body whose deliberation is subject to the requirements of SEPA is empowered by that act to deny a project application on environmental grounds. In *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978) this court recognized this substantive aspect of SEPA as a supplement to all other statutory authorization. The procedural requirements of SEPA for consideration of the environmental effects of proposed developments will not be rendered

meaningless by denying the authority of the decision maker to reject a proposal on the basis of the adverse environmental effects it has discovered through the process. *See* RCW 43.21C.060, a provision of SEPA recognizing the authority of the governmental decision–making body to condition or deny a request for action on the basis of specific adverse environmental impacts.

Similarly, there can be no question of the application of SEPA to the plat–approval process. The Thurston County Board of County Commissioners is required by SEPA to deliberate on environmental concerns as a part of the platting decision process. *Loveless v. Yantis,* 82 Wn.2d 754, 513 P.2d 1023 (1973). The requirement of the platting statute in RCW 58.17.110 that the County Commissioners determine if "the public use and interest will be served by the platting" in fact serves to emphasize the significance of early inquiry into environmental matters. *Loveless v. Yantis, supra* at 765.

As noted in *Loveless,* the absence of environmental criteria from the platting statute is immaterial, for the obligation and authority to consider such matters is provided by SEPA.

As we have repeatedly pointed out, SEPA is an overlay of law which supplements existing statutory authority. *See for example Bellevue v. King County Boundary Review Bd.,* 90 Wn.2d 856, 586 P.2d 470 (1978); *Polygon Corp. v. Seattle, supra; Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976); *Eastlake Community Council v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 513 P.2d 36, 76 A.L.R.3d 360 (1973). Thus, it makes no difference that the platting statute does not provide explicit authority to deny the plat on environmental grounds, because SEPA does provide such authority. The Commissioners here were required by SEPA to consider the possible adverse impact of the proposed plat on the use of Wood Point for eagle perching and feeding, and were empowered by SEPA to deny the plat on the ground the

adverse impact was too great. The question remains, however, what legal effect the Shorelines Hearings Board's finding had on the Commissioners' reconsideration of the plat.

It is respondents' contention that the Commissioners were bound by the Board's finding that the proposed plat provided adequate safeguards to protect the eagles, since they took no appeal from the Board's decision. They maintain the Commissioners were thus barred from receiving additional evidence on the issue upon reconsideration, and likewise were barred from reaching a different conclusion on the factual question. Since the Commissioners specifically found that the proposed plat met all requirements of the platting statute and the County Code, respondents maintain the Commissioners are therefore compelled to approve the application. This argument misconstrues the nature of the SEPA mandate for environmental consideration, and the scope of the Shorelines Hearings Board's jurisdiction.

The Board's jurisdiction under the Shoreline Management Act of 1971 in this case was to determine whether the request for a substantial development permit is consistent with the County's Shorelines Master Program and the provisions of the SMA. RCW 90.58.140(2)(b). The act provides for direct regulation of activities within the "shorelines" of the state, which are defined to include the lands extending landward for 200 feet from the high water mark. RCW 90.58.030(2)(d), (f). In making its determination whether a permit for development within this shoreline may issue, the Board is subject to the mandates of SEPA to consider environmental concerns. *Sisley v. San Juan County*, 89 Wn.2d 78, 569 P.2d 712 (1977). It is likewise empowered by SEPA to deny or condition the permit application on the basis of specific adverse environmental effects discovered in the process of these deliberations. *See Polygon Corp. v. Seattle, supra;* RCW 43.21C.060. The scope of the Board's jurisdiction, however, is not broadened by the provisions of SEPA. The Board is empowered to

determine whether a shoreline substantial development permit should issue, and its deliberations under SEPA are confined to that purpose.

This fact was recognized by the Board in its final findings, conclusions and order. The Board specifically stated it was reviewing the denial of the shoreline permit "within the context of the Shoreline Management Act. . . . Other requirements and approvals for the proposal must nonetheless be met before the proposal can proceed." The Board also limited its conclusions of law to determination of the consistency of the proposal with the County's Master Program and the Shoreline Management Act.

In short, the Board's finding that the proposed plat was adequate to protect against adverse effects to the eagles is limited in its relevance and binding effect to the narrow jurisdiction which the Board is empowered to exercise. Implicit in the Board's finding that the plat is adequate is the qualification that the finding is made *for the purposes of a shoreline development* permit. It cannot bind the County Commissioners in their determination of an entirely different question—whether the preliminary plat should be approved. This conclusion follows from the limited and differing jurisdictions of the decision–making agencies, and from the unique nature of SEPA as a supplement to the statutory authority of each agency.

In contrast to the jurisdiction of the Shorelines Hearings Board to inquire into the consistency of a proposed shoreline development with the County's Master Program and the Shoreline Management Act of 1971, the County Commissioners must inquire "into the public use and interest proposed to be served" by the plat. RCW 58.17.110. Its jurisdiction is not restricted to consideration of the project's effect on the waters and the relatively narrow strip of land bordering them. Indeed, in this case, some of the perching trees used by the eagles at Wood Point are outside the 200–foot area of the shoreline, and are therefore beyond the power of the Shorelines Hearings Board to directly regulate. *See* RCW 90.58.140, .180. These trees and the rest of

the eagle habitat are the special concern of the Commissioners in determining whether to approve the preliminary plat, however, and in considering the plat's effect on this habitat they must bring a broader view of the project to bear.

In summary, the environmental determinations mandated by SEPA are uniquely related to the particular decision being taken, and are conclusive only for that purpose. They are not binding on other decision–making bodies. To hold otherwise would allow one decision–making body to preempt the authority of any other decision–making body considering a related question to evaluate a particular environmental issue, and would foreclose independent analysis and deliberation. Such a result could contravene the clear intent of SEPA to infuse every governmental exercise of discretion with consideration of environmental amenities and values. *See* RCW 43.21C.030.

It follows from our conclusion that the Commissioners are not bound by the finding of the Shorelines Hearings Board, that they had authority to take additional testimony for the purpose of reconsidering the plat proposal, and had authority to deny the plat on the ground it was inadequate to protect the County's valued resource of a perching and feeding site for the endangered bald eagle.

## II

The trial court held the Commissioners' determination that approval of the plat was not in the "public interest" was an unconstitutionally vague application of the platting statute. Since we are not concerned here with a regulatory statute prohibiting certain types of conduct and imposing sanctions for violation of its standards, the vagueness doctrine as such is not applicable. *See Blondheim v. State,* 84 Wn.2d 874, 878, 529 P.2d 1096 (1975). We interpret the trial court's conclusion to be a determination that the authority granted to the Board of Commissioners to deny a plat in the public interest does not meet constitutional standards for a delegation of legislative power. As

noted above, the Commissioners' authority to deny the plat on environmental grounds derives essentially from SEPA, and not from the platting statute alone.

■ The validity of SEPA as a delegation of substantive legislative authority to apply its standards in a particular case was specifically upheld in *Polygon Corp. v. Seattle, supra* at 66. The court held that SEPA provides constitutionally adequate guidelines for governmental decision making under the act, and that procedural safeguards are adequate if an opportunity to be heard is provided, and judicial review of the entire record is available. That is the case here. We therefore conclude there is no constitutional objection to the Commissioners' exercise of their authority under SEPA to deny the plat on environmental grounds.

### III

■ The remaining issue is whether the trial court erred in its determination that denial of the plat on the ground it was inadequate to protect the eagle habitat was an unconstitutional taking of private property for public use, in violation of Const. art. 1, § 16 and the fifth amendment to the United States Constitution. As a preliminary matter, the Commissioners raise the question whether the taking provisions apply in this case, since the property at issue is owned by the State. Under the rule of *Moses Lake School Dist. 161 v. Big Bend Community College,* 81 Wn.2d 551, 503 P.2d 86 (1972) there can be no unconstitutional taking when the property taken is public and not private. While this rule may preclude respondent Department of Natural Resources from complaining, Lake Lawrence, Inc., as lessee of the land, has a private real property interest which entitles it to raise the question whether its leasehold has been taken for public use without compensation.

■ The determination whether a regulation is an unconstitutional taking requires a balancing of the nature of the infringement of private property interests against the public interest in imposing the regulation in question. *Maple Leaf Investors, Inc. v. Department of Ecology,* 88

Wn.2d 726, 565 P.2d 1162 (1977). In considering the encumbrance on the property owner, the court will consider both the type of encumbrance imposed and whether the owner is thereby prevented from making a profitable use of the property.

Of crucial importance in this case is the fact that the Commissioners' decision to deny the plat leaves open the possibility of approving a less dense development of Wood Point. The Commissioners have consistently maintained they would entertain an application for a plat which provided an adequate buffer zone for protection of the eagles' preferred perching and feeding areas. It should be noted that the Commissioners did not find any adverse impact from development of 11 of the proposed lots. Moreover, the findings provide specific guidelines for planning a buffer zone the Commissioners would find acceptable. Finally the decision left open the possibility of an alternate cluster configuration for the development—a configuration specifically favored by the County's Comprehensive Plan.

Thus, while it is clear the Commissioners will not approve a plat providing the single–family unit density proposed by respondents here, specifically because that degree of density does not provide adequate protection for the eagle habitat, the decision leaves open the possibility of a less dense development which would preserve the eagle perching resource. The facts apparent from the record in this case do not support a conclusion that "there is no present, possible, and reasonably profitable alternative use to which his property is adaptable." *Carlson v. Bellevue*, 73 Wn.2d 41, 51, 435 P.2d 957 (1968).

We also note there is no physical intrusion or damage created by the regulation, no public project is enhanced, and no public use of the land is created. *See Rains v. Department of Fisheries*, 89 Wn.2d 740, 575 P.2d 1057 (1978); *Maple Leaf Investors, Inc. v. Department of Ecology, supra* at 733.

The strong public policy interest being advanced by this regulation of respondent's use of the leasehold is the preservation of a valuable environmental resource which is identified as such in the County's Master Program. Where, as here, the Commissioners' decision does not deny to respondent all reasonably profitable uses, but only requires that the use be adapted to protect an important environmental resource, we find no taking in violation of the state and federal constitutions.

Our decision that the County Board of Commissioners' denial of the preliminary plat application is valid renders moot the question whether the trial court erred in issuing a writ of mandamus. We also need not reach the other assignments of error made by the appellant Commissioners. Respondents raised new questions in their briefs regarding the Commissioners' compliance with due process requirements in conducting the hearings on remand. These arguments were not made below, and the court entered no findings on the question. It is apparent, however, from the additional material provided in the Commissioners' reply brief that respondents were fully accorded due process through notice and opportunity to be heard.

Reversed.

UTTER, C.J., ROSELLINI, WRIGHT, BRACHTENBACH, DOLLIVER, HICKS, and WILLIAMS, JJ., and HUNTER, J. Pro Tem., concur.

Reconsideration denied February 20, 1980.